DELBELLO DONNELLAN WEINGARTEN
WISE & WIEDERKEHR, LLP
*Proposed Attorneys for the Debtor*
One North Lexington Avenue
White Plains, New York 10601
(914) 681-0200
JONATHAN S. PASTERNAK, ESQ.
ERICA R. FEYNMAN, ESQ.

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:

56 WALKER LLC,

                    Debtor.
-------------------------------------------------------------X

Chapter 11

Case No. 13-11571 (ALG)

**DECLARATION OF GUY MORRIS PURSUANT TO LOCAL
BANKRUPTCY RULE 1007-2**

     GUY MORRIS, declares under penalties of perjury:

     1.     I am the sole managing member of 56 Walker LLC, the above-referenced debtor and debtor-in-possession (the "Debtor") as well as the sole member of the Debtor. As such, I am familiar with the Debtor's operations, businesses and financial affairs.

     2.     I submit this declaration pursuant to Rule 1007(d) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 1007-2 of the Local Rules for the United States Bankruptcy Court for the Southern District of New York.

**Background of the Debtor**

     3.     The Debtor is a single asset real estate entity that owns the land and building located at 56 Walker Street, New York, New York (the "Property").

Description of the Property

     4.     The Property is located on the north side of Walker Street between Broadway and Church Street in New York City, in the designated "Tribeca West Historic District"

section of Lower Manhattan. The area is characterized by a mixture of residential loft buildings, trendy restaurants, 'quick' food stores, a wide variety of high-end retail establishments, and food and dry goods wholesalers.

5. Due to the extensive presence of artists, Tribeca is considered one of Manhattan's trendiest neighborhoods. The shopping areas of Soho and Greenwich Village are within walking distance and are easily accessible by public transportation. Tribeca is conveniently reachable by all forms of public transportation.

6. The special Tribeca Mixed Use District, Area B-1 permits residential use as-of-right from the 2nd floor and up. The remaining uses are primarily commercial and industrial which includes retail.

7. The existing improvements contain a gross building area of approximately 18,000 sq. feet; this includes mezzanine areas, which are not counted as building area for zoning purposes. The area excluding mezzanines is 11,525 sq. feet.

8. The Property falls into an M1-5 Light Manufacturing District and is located the Tribeca Mixed Use District, Area B-1. This district is designed for a wide range of manufacturing and related uses, which can conform to a high level of performance standards; manufacturing establishments of this type provide a buffer between commercial districts and other industrial uses which involve more objectionable influences.

9. The building is situated on a foundation of stone/brick and reinforced concrete and has masonry exterior walls, a cast iron facade, wooden floors, roof trusses and a roof deck with an elastomeric cover.

10. The building consists of 6 floors and a fully functional basement, recently retrofitted for use as a restaurant/cabaret. The first floor is a commercial space; the second floor has mixed use for residential and commercial; floors 3 through 5 are strictly residential

and the 6th floor contains a penthouse with roof access.

11. The Debtor acquired the Property in 2003 for approximately $3 million. The acquisition and initial construction was capitalized through a combination of my own personal funds of approximately $1.5 million to $ 2million and partial third party financing of approximately $ 4million.

12. The Debtor gutted the top three floors of the Property and built out the floors and added a new penthouse floor. I also brought in a partner, Leonard Lobanco, who agreed to gut and undertake the build-outs needed for the basement and first and second floors, which he successfully completed and paid for with his own personal funds. In exchange for Lobanco's contributions, the Debtor entered into a long term lease with Lobanco's company (INN World Report, Inc.) for the basement, first and second floors for nominal rent ($24,000 per year) and as part of the agreement, Lobanco would manage the Property for a monthly management fee.

13. Notwithstanding Lobanco's beneficial efforts, the construction of the balance of the building was plagued by construction and professional delays. But the Debtor persevered and ultimately completed the total renovation of the Property.

14. Partial mezzanine floors have been constructed between levels 1-2, 2-3, 3-4 and 4-5 to the interior of the building. The nearly 15 - 20 feet ceiling heights on the first five levels have allowed for the construction of these additional partial floors. The mezzanines have structural steel floor trusses that are attached within the exterior masonry walls and have a wood subfloor. There is sheetrock over wood stud walls on the leading edge of the mezzanines that have resulted in separated living areas. The resulting units have been duplexed and in some cases tri-plexed into multi-floor units.

15. The newly constructed penthouse apartment totals 1,683 sq. ft. The total floor area in the building is (excluding cellar) totals approximately 18,000 square feet.

3

16. The building is heated by individual gas fired units and cooled by roof-mounted AC units. The building has a full sprinkler system with pumps installed in the basement, extinguishers, smoke detectors and stand pipe and fire alarm systems

17. The area near 56 Walker Street is characterized by a mixture of residential loft buildings, trendy restaurants, established food and dry goods wholesalers and some manufacturers. The zoning code was revised in the 1970s to permit mixed manufacturing and residential use of the same structures. The residential character of the area has grown as landlords, realizing the need for tenants after the departure of many of the commercial businesses, started to turn to artists to rent their warehouse buildings. This influx of artists changed TriBeCa into an area of residential and commercial uses. By the early 1980's, it had garnered a reputation as one of the city's trendiest neighborhoods and continues through the present.

18. Restaurant growth has been phenomenal since 1990s. Restaurants are frequently located off the main commercial concentrations. Warehouse and distribution businesses in the area specialize in dairy foods and continue with new development, often serving new restaurants or retail outlets. Luxury retail stores are increasingly replacing smaller businesses in the area.

19. The shopping areas of Soho and Greenwich Village are within walking distance and easily accessible by public transportation. The Canal Street corridor (located north of Walker Street) comprises small retailers and service providers, including single outlet "quick" food stores. Several national retailers are located along Broadway. Retail space is generally located at the street levels throughout the area.

20. Tribeca is well serviced by public transportation: Subway stops include the 1, 2 and 3 trains to Canal Street, Franklin Street and Chambers Street; A, C and E trains to Canal

4

Street and Chambers Street; and R and N trains to City Hall. Bus transportation is provided by the MI, M6 and M10 buses. Walker Street is also within walking distance from the PATH stop at Spring Street and Avenue of The Americas.

21. The Property is currently being aggressively marketed for sale by Sotheby's International Realty pursuant to an Exclusive Listing Agreement recently entered into by the Debtor on February 13, 2013.

22. The Debtor believes the current fair market value of the Property to be in excess of $23 million.

History of Financing for the Property

23. Prior to purchasing 56 Walker Street, I, together with my business partner, Len Lobanco, rented the building for a television production business (SG Media) that we founded and operated beginning in 1996. In mid-2003, following the death of the building owner, the owner's estate decided to place 56 Walker Street on the market. I purchased the building for $3 million in November 2003 with the objective to restore the post Civil War historic building and convert the upper floors to condominium apartments. To finance the renovation and conversion, I secured construction loan financing from Community Capital Bank of Brooklyn (CCB).

24. Using the Debtor as the development vehicle, I began with the objective of converting the upper three of the original six floors to apartment condominiums, using a simple "white box" design. The plan for the remaining three floors was to be reserved by SG Media for use in connection with its television production business. The first or ground floor was finished as a stage, and the second floor was redesigned to house the television technical control facilities, studio and work area. The basement was reconstructed as a combined utility and reception and restaurant area.

5

25.    Due to construction problems related to the first contractor employed on the project, significant delays were encountered. As a result, a replacement construction team was brought in, including a new contracting company and construction management company. In addition, the architectural firm of Joseph Pell Lombardi was retained to develop a plan for the building meeting new requirements which I specified.

26.    I decided to seek a new plan to maximize the space provided by the high ceilings at 56 Walker Street, thereby increasing the useable floor space area within the building. Following these directions, the architects developed an expanded design, which added one or two mezzanines on several floors, thereby increasing the useable floor space by some 2100 square feet. The re-design also provided for the addition of a 1900+ square foot penthouse, together with a 700 foot roof-top terrace, plus front and rear terraces adjoining the new penthouse floor.

27.    To accommodate the design changes, I refinanced the original CCB note in December 2005 with Titan Capital in the amount of $6.5 million.  Six months later, as a result of a disagreement related to the construction budget, Titan, pursuant to terms of its contract, elected not to proceed with the project.  At this stage, I secured a second refinancing in the amount of $8,750,000  in June 2006 as  provided by Madison Capital. The series of changes involving contractors, architects and financing companies caused significant delays.

28.    On January 2, 2007, the Debtor secured the necessary Landmark Commission building permit (COFA Number:   COFA 07-4432 ; Docket    07-4201.)

29.    The renovation and construction was at approximately the 83% completion stage at the termination of the Madison Capital note in June 2007.  I then secured a joint venture construction loan from WexTrust Capital, LLC in September 2007 in the amount of $11.3 million.  Included in the loan joint venture were Wextrust and its partners, Wexford/HPC

6

Mortgage Fund, LP, and Broadway Bank of Chicago. The Debtor received only a portion of the construction funds before Wextrust was seized and its founders were arrested and later convicted for operating a $270 million Ponzi Scheme and mortgage fraud. The U.S. Government, led by the Securities and Exchange Commission, determined that Wextrust had been insolvent and operating a criminal enterprise dating to its founding in 2005. The SEC also determined that 56 Walker LLC had been a non-investor victim of the Ponzi Scheme by entering into the Wextrust mortgage loan scam.

30. Some time following the arrest of the Wextrust founders and chief executives, Broadway Bank was seized by Illinois state banking regulators, and placed in receivership with the FDIC. Certain of its assets, allegedly including the 56 Walker mortgage and note, were sold to MB Financial Bank, also of Chicago. Thereafter disputes arose between the Debtor and MB Financial. The Debtor maintained that its loan transaction was the product of the Wextrust criminal fraud, and therefore void. Further, since MB Financial has not offered evidence that it has legal possession or title to the 56 Walker LLC mortgage and note, the debtor has taken the position that the bank's claim is invalid.

Debtor's Prior Chapter 11 Case

31. As the Court is aware, the Debtor previously filed for Chapter 11 relief before this Court on September 23, 2011. The case was assigned case no. 11-14480(ALG).

32. In the prior Chapter 11 case, the Debtor made good faith efforts to resolve its disputes with Wexford/HPC and MB Financial; however the settlements became tainted, and MB Financial and its counsel took ultra vires acts against the Debtor's interests prior to the finalization and Court approval of any global settlement, which settlement contained other material defects conceived by MB Financial and its representatives..

33. The Court thereafter denied approval of the settlement and ultimately dismissed

the Chapter 11 case on August 10, 2012.

Debtor's State and Federal Litigation Against MB Financial and Other Parties..

34.  In addition to the pending state court foreclosure proceedings commenced by MB Financial in 2009[1], on February 4, 2013, the Debtor and I as co-plaintiffs commenced a new action in the United States District Court for the Southern District of New York, Manhattan Division (Cote, J.) encaptioned 56 Walker, LLC, Guy Morris and John Morris v. MB Financial, Inc., Broadway Bank, Wextrust Capital, LLC, Et Al. (the "Federal Action") under Index No. 13-00782.

35.  The Federal Action seeks damages related to fraud allegedly committed by WexTrust, MB Financial and numerous other related parties. .

36.  The action is still in the initial pleading phase, and the Debtor filed a status report on May 3, 2013 and has sought a postponement due to certain complications with respect to its need to replace its lead counsel. Motions to dismiss have already been filed by multiple defendants.

Debtor's Intentions Regarding the Property

37.  Notwithstanding the fact that the Debtor believes it holds material claims against MB Financial and others, it realizes that it is in the best interests of its estate to promptly realize the current value of the Property and to liquidate same in order to create an estate from which allowed claims can be adjudicated in an expeditious manner and in a forum designed for the swift administration of assets and claims thereto.

---

[1] On March 11, 2013, the State Court granted MB Financial's motion for Summary Judgment of Foreclosure in part based on MB Bank's allegation that by entering certain agreements in connection to the failed settlement agreement referenced in ¶ 32, the Debtor had agreed and acknowledged that MB Bank "holds a valid, first priority lien against [56 Walker Street] …and [it had] released all claims against and challenges to [MB Bank's] lien…" I believe these actions by MB Bank were directly contrary to orders issued by this Court in the prior Chapter 11 case and the assurances that the Debtor left the first bankruptcy with all of the rights, claims and defenses it had before the proceeding began. I consider MB Bank's actions in the foreclosure case to have directly violated this Court's previous order and rulings. The Debtor has recently appealed such decision.

38. To that end, the Debtor has recently entered into a listing agreement with Sotheby's International for the prompt and commercially reasonable sale of the Property, which sale shall be subject to Bankruptcy Court approval.

39. The Property, other than Mr. Lobanco's tenancy interests, is free of any tenancies, and Mr. Lobanco has indicated his willingness to surrender possession and vacate prior to closing on a sale of the Property by the Debtor. The building has been cleaned up and readied for immediate sale.

40. Notwithstanding, the Debtor still needs some additional reasonable time to sell the Property in a commercially reasonable manner.

41. Presently, the Debtor estimates that Wexford/HPC Mortgage Fund and MB Financial claims to be owed in the aggregate approximately $13,250,000 in unpaid principal and accrued interest, subject to the Debtor's varied disputes, defenses, claims and counterclaims. Based upon valuations expressed by both the Debtor's advisors and Sotheby's, the Debtor believes the Property is worth in excess of $23 million.

42. The Debtor filed this new chapter 11 case to first preserve and then immediately maximize the value of the Property through a traditional bankruptcy sale process and to avoid a foreclosure sale which would yield far less in sale proceeds to the detriment of all the other creditors of the estate.

43. On or about February 13, 2013, the Debtor engaged the services of Sotheby's International Realty, a well-known real estate brokerage firm in New York City in order to market and sell the Property for the highest and best price. The Debtor intends to seek the approval of the Bankruptcy Court for the retention of Sotheby's to market and sell the Property which proceeds would be used to fund a Liquidating Chapter 11 Plan.

44. By this Chapter 11 filing, the Debtor hopes to complete the marketing and sale

9

...

process in a reasonable amount of time to maximize the value of the Property for all of its creditors, secured and unsecured alike.

## INFORMATION REQUIRED BY LOCAL BANKRUTPCY RULE 1007

45.    In addition to the foregoing, Local Bankruptcy Rule 1007-2 requires certain information related to the Debtor, which is set forth below.

**Local Rule 1007-2(a)(1)**

46.    The Debtor is located at 56 Walker Street, New York, New York and owns and operates residential real property at the same location.

**Local Rule 1007-2(a)(2)**

47.    This case was not originally commenced under Chapter 7 or 13 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.*, as amended by the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005.

**Local Rule 1007-2(a)(3)**

48.    Upon information and belief, no committee was organized prior to the order for relief in this Chapter 11 case.

**Local Rule 1007-2(a)(4)**

49.    A list of the names and addresses of the Debtor's 20 largest unsecured claims, excluding those who would not be entitled to vote at a creditors' meeting and creditors who are "insiders" as that term is defined in 11 U.S.C. Section 101(31) is annexed hereto as **Schedule I**.

**Local Rule 1007-2(a)(5)**

50.    A list of the names and addresses of the five largest secured creditors is annexed hereto as **Schedule II**.

**Local Rule 1007-2(a)(6)**

51.    The Debtor does not have a recent balance sheet.

**Local Rule 1007-2(a)(7)**

52.  There are no publicly held securities of the Debtor.

**Local Rule 1007-2(a)(8)**

53.  None of the Debtor's property is in the possession of any custodian, public officer, mortgagee, pledge, assignee of rents, or secured creditor, or any agent for such entity, except that a receiver, Laurence W. Nagin, was appointed by the state court and which receiver is currently in possession of the 3rd and 6th floors of the Property.

**Local Rule 1007-2(a)(9)**

54.  The Debtor owns property located at 56 Walker Street, New York, New York.

**Local Rule 1007-2(a)(10)**

55.  The Debtor's books and records are located at the Property and with the Debtor's various professionals.

**Local Rule 1007-2(a)(11)**

56.  The following lawsuits are currently pending against the Debtor:

> *MB Financial Bank, N.A. v. 56 Walker, LLC, Et Al..*
> New York State Supreme Court, New York County,
> Index No.: 105617/2009.

**Local Rule 1007-2(a)(12)**

57.  The Debtor is currently managed by Deponent, who has done so since the Debtor's formation.

**Local Rule 1007-2(b)(1) and (2)**

58.  The Debtor has no current employees.

**Local Rule 1007-2(b)(3)**

59.  A schedule of the income and expenses anticipated over the next thirty (30) days is annexed hereto as **Schedule III.**

## **CONCLUSION**

60. The Debtor believes it is in the best interests of all of it creditors that it be afforded an opportunity to refinance and reorganize its obligations in Chapter 11.

61. The needs and interests of the Debtor and its creditors will best be served by the Debtor's possession of its assets and management of its affairs as a Debtor-in-Possession under Chapter 11 until confirmation of a reorganization plan.

62. Pursuant to 28 U.S.C. § 1746, I declare under the penalty of perjury that the foregoing is true and correct.

*/s/ Guy Morris*
Guy Morris

## Schedule I

## List of Debtor's 20 Largest Unsecured Creditors

**SEE ATTACHED**

**Schedule II**

**List of Debtor's 5 Largest Secured Creditors**

MB Financial Bank
611 North River Rd
Rosemont, IL 60018
$12,500,000 (Unliquidated/Disputed)

Wexford/HPC
c/o Blackrock Investment Group
901 S.E. 217th Street
Ft. Lauderdale, FL 33316
$750,000 (Unliquidated/Disputed)

VCD Construction
751 Carroll Street
Brooklyn , NY 11231
$353,193.10

J.P. Lombardi Architects
412 Broadway
New York, NY 10013
$290,000 (Disputed)

**Schedule III**

**30 Day Budget**

**TO BE PROVIDED**